IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

HERBERT DOZIER and TRACEY     §
DOZIER,                        §
                               §
        Plaintiffs,            §
                               §
v.                             §          CIVIL NO. H-04-3475
                               §
ROWAN DRILLING COMPANY, INC.,  §
and SPINNAKER EXPLORATION      §
COMPANY L.L.C.,                §
                               §
        Defendants.            §

**MEMORANDUM AND ORDER**

Pending before the court[1] are Defendants' Motion to Strike Jury Demand (Docket Entry No. 25) and Plaintiffs' Motion for Leave to File Their First Amended Complaint (Docket Entry No. 26). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **DENIES** Defendants' motion and **GRANTS** Plaintiffs' motion.

**I.  Case Background**

This negligence action arises out of injuries allegedly sustained by Plaintiff Herbert Dozier on December 20, 2003, while he was working on the ROWAN FORT WORTH, a jack-up drilling rig,[2]

---

[1]     This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry No. 38.

[2]     "A jack-up drilling rig is a floating rig with legs that can be lowered into the seabed. Once the legs are secured in the seabed, the rig can be 'jacked-up' out of the water to create a drilling platform." Demette v. Falcon Drilling Co., 280 F.3d 492, 495 (5th Cir. 2002).

located on the outer Continental Shelf off the coast of Louisiana.[3]

Plaintiff Herbert Dozier, an employee of Baker Atlas, was performing wireline services, a component of drilling operations, on the rig, which was owned by Defendant Rowan Drilling Company, Inc., and operated by Defendant Spinnaker Exploration Company, L.L.C.[4] While he was conducting a wireline test for the open hole drilling, he climbed up on the casing and fell backwards approximately eight feet, landing on his back and head.[5]

A few weeks later, Plaintiff Herbert Dozier filed a claim for workers' compensation under the Outer Continental Shelf Lands Act ("OCSLA") and the Longshore and Harbor Workers' Compensation Act ("LHWCA").[6] He began to receive benefits shortly thereafter.[7]

Plaintiffs filed suit in this court on September 2, 2004, alleging negligence and seeking $750,000 as damages for Plaintiff

---

[3]     Plaintiffs' Original Complaint, Docket Entry No. 1, ¶ 5; Plaintiffs' First Amended Original Complaint, Docket Entry No. 27, ¶ 5; see also Plaintiffs' Response to Defendants' Motion in Opposition to Plaintiffs' Motion for Leave to File Their First Amended Original Complaint ("Plaintiffs' Reply"), Docket Entry No. 32, p. 2 (stating that the drilling rig was affixed to the seabed on the outer continental shelf); p. 8 (stating that the ROWAN FORT WORTH is "a jack-up drilling rig").

[4]     Plaintiffs' Original Complaint, Docket Entry No. 1, ¶ 5; Plaintiffs' First Amended Original Complaint, Docket Entry No. 27, ¶ 5; see also Defendants' Opposition to Plaintiffs' Motion for Leave to File First Amended Original Complaint and Supplement to Defendants' Motion to Strike Jury Demand ("Defendants' Response"), Docket Nos. 28, 29, p. 4; Plaintiffs' Reply, Docket Entry No. 32, pp. 6, 8.

[5]     Plaintiffs' Original Complaint, Docket Entry No. 1, ¶ 7; Plaintiffs' Reply, Docket Entry No. 32, p. 8.

[6]     See Defendants' Response, Docket Entry Nos. 28, 29, Ex. D, Plaintiff Herbert Dozier's compensation application and record.

[7]     See id.

Herbert Dozier's injuries and $100,000 as damages for Plaintiff Tracey Dozier's loss of consortium.[8]   In their complaint, Plaintiffs alleged jurisdiction "under the General Maritime Law; 33 U.S.C. [§] 905(b); 28 U.S.C. § 1332,[9] and the laws of the State of Texas."[10]   Plaintiffs requested a jury trial at time of filing.[11] In November, the parties filed their joint discovery/case management plan, which indicated that the parties agreed that jurisdiction in this court was proper under "33 USC§905 [sic]; Admiralty or General Maritime Law" and that a jury demand was made timely.[12]   The court set February 4, 2005, as the deadline for amending the pleadings.[13]

According to Defendants' brief, several months later Defendants' attorney realized that Plaintiffs were not entitled to a jury under maritime law and requested that Plaintiffs agree to strike the jury demand.[14]   Apparently, Plaintiffs refused and, instead, filed their motion for leave to amend four and one-half

---

[8]     See Plaintiffs' Original Complaint, Docket Entry No. 2, ¶¶ 8, 11-13.

[9]     Although Plaintiffs originally alleged diversity jurisdiction in addition to maritime jurisdiction, it is clear from the complaint itself that the parties are not completely diverse.  See id. at ¶¶ 2-4.

[10]     Id. at ¶ 1.

[11]     See Defendants' Response, Docket Entry Nos. 28, 29, Ex. A, Civil Cover Sheet.

[12]     Joint Discovery/Case Management Plan Under Rule 26(f) Federal Rules of Civil Procedure, Docket Entry No. 11, ¶¶ 4-5, 18.

[13]     Docket Control Order, Docket Entry No. 13; see also Scheduling Order, Docket Entry No. 43.

[14]     See Defendants' Response, Docket Entry Nos. 28, 29, p. 3.

months after the amendment deadline set by the scheduling order.[15]

Plaintiffs' proposed First Amended Original Complaint changes the jurisdictional basis to the OCSLA and the laws of the State of Louisiana.[16] Additionally, Plaintiffs made several other changes to provide more factual detail, including the specific allegation that Plaintiff Herbert Dozier was performing wireline services related to the exploration and development of natural resources on the outer Continental Shelf off the shore of Louisiana when the alleged injury occurred.[17] Plaintiffs also added details to their allegations of negligence and doubled Plaintiff Herbert Dozier's request for damages.[18] Defendants oppose this amendment.

## II. Applicable Law

Facially, the motions request rulings on Plaintiffs' right to amend and Plaintiffs' right to a jury trial, but the fundamental issue and true point of contention is whether this action is governed by maritime law or Louisiana law.[19] The parties

---

[15] See id.; Plaintiffs' Motion for Leave to File Their First Amended Original Complaint, Docket Entry No. 26.

[16] See Plaintiffs' First Amended Original Complaint, Docket Entry No. 27, ¶ 1.

[17] See id. at ¶ 5.

[18] See id. at ¶¶ 5, 7, 8, 12.

[19] At this point, the parties seem to agree that, if state law applies, the law of Louisiana is the proper body of state law. See id. at ¶ 1; Defendants' Response, Docket Entry Nos. 28, 29, p. 7 ("Of course, if Plaintiff's injury had occurred on a fixed platform and not a vessel, then Louisiana law would be applied as surrogate federal law; and Plaintiffs would be entitled to apply Louisiana law and not 905(b) of the LHWCA.")

4

acknowledge as much in their briefs.[20] Defendants' position is that the application of maritime law would preclude a jury trial. Plaintiffs hold that the cause of action is actually governed by Louisiana state law as surrogate federal law under the OCSLA. Without a doubt, the Fifth Circuit law applicable to the issue is confusing.[21] And, frankly, the parties' briefs have not helped to elucidate matters. In fact, their briefs suggest misapprehension, ignorance, or manipulation of relevant case law. Assuming that the problem is misapprehension, the court embarks on an overview of the

---

[20]    See Defendants' Response, Docket Entry Nos. 28, 29, p. 1 ("The legal issue presented . . . is whether this cause of action should be governed by the maritime law of the United States . . . as alleged in Plaintiffs' Original Complaint or the [OCSLA] . . . and the laws of the State of Louisiana as alleged in the Plaintiffs' First Amended Original Complaint."); Plaintiffs' Response to Defendants' Motion to Strike Jury Demand, Docket Entry No. 30, p. 3 (unnumbered)("Based upon the factual basis of this claim, the Plaintiff [sic] would contend that the OCSLA requires that the state law of Louisiana apply to this case.").

[21]    Cf. Hoda v. Rowan Cos., 419 F.3d 379, 380 (5th Cir. 2005)(questioning whether the Fifth Circuit's precedence on the difference between maritime and nonmaritime contracts related to offshore exploration and production is "the soundest jurisprudential approach"); Hodgen v. Forest Oil Corp., 87 F.3d 1512, 1523-24 (5th Cir. 1996)(acknowledging that Fifth Circuit case law regarding OCSLA's incorporation of state law raises a number of questions); Smith v. Penrod Drilling Corp., 960 F.2d 456, 461 and n.3 (5th Cir. 1992)(recognizing that each new case requires courts to "comb through a bewildering array of cases that rely upon inconsistent reasoning in the hope of finding an identical fact situation"). In Demette, the Fifth Circuit certainly clarified some aspects of OCSLA application, but left questions swirling in its wake. Cf. Demette, 280 F.3d at 504-19 (DeMoss, J., dissenting)(calling for an en banc review of the case); Dean A. Sutherland, *Significant Developments in Maritime Personal Injury Law*, 64 La. L. Rev. 299, 300-01, 310 (2004)(criticizing the Demette majority for misinterpreting the 1978 amendments to the OCSLA); E. Stewart Spielman, *Drilling Through the Muddied Waters on the Outer Continental Shelf: An Examination of the Fifth Circuit's Recent Decision in Demette v. Falcon Drilling Co.*, 26 Tul. Mar. L.J. 683, 694 (2002)(suggesting that the Demette majority decision did not make a clear path for lower courts to follow); Ellie T. Schilling, *Demette v. Falcon Drilling Co.: The Sinking Ship of Fifth Circuit Precedent Construing the Outer Continental Shelf Lands Act and Maritime Law*, 76 Tul. L. Rev. 1785, 1796-97 (expressing the concern that the Fifth Circuit may have been incorrect in its approach to determining whether state law applies by operation of the OCSLA).

applicable legal landscape.

## A. __Statutory Authority__

The OCSLA, enacted in 1953, separately addresses what legal jurisdiction applies to certain structures and installations on the outer Continental Shelf and what type of compensation is due workers injured as a result of operations on the outer Continental Shelf. See 43 U.S.C. § 1333. As to the first, the OCSLA expanded federal jurisdiction and defined a body of federal law to govern conduct on the outer Continental Shelf. See Rodrigue v. Aetna Cas. & Sur. Co., 395 U.S. 352, 355-56 (1969); Hufnagel v. Omega Serv. Indus., 182 F.3d 340, 349 (5th Cir. 1999). Although Congress intended for federal law to prevail, it recognized that federal law was inadequate in many areas and needed to be supplemented by state law. See Rodrigue, 395 U.S. at 362-66; Hufnagel, 182 F.3d at 349. Thus, the OCSLA incorporated applicable state civil and criminal laws as surrogate federal law to the extent that they are "applicable and not inconsistent with" the OCSLA and other federal laws. 43 U.S.C. § 1333(a)(2)(A).

The language of the OCSLA is important in determining the scope of its application and, therefore, is quoted here at length:

(a) Constitution and United States laws; law of adjacent States; . . .

(1) The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the

6

seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources, to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State . . . .

(2)(A) To the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereafter adopted, the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . .

43 U.S.C. § 1333(a).

The statute also incorporated compensation benefits of the LHWCA. 43 U.S.C. § 1333(b). The LHWCA is a workers' compensation scheme generally applicable to persons injured during the course of maritime employment upon navigable waters. 33 U.S.C. § 902(3); 903; see also Fontenot v. Dual Drilling Co., 179 F.3d 969, 972 (5th Cir. 1999). The OCSLA extended the LHWCA's workers' compensation coverage to include persons injured while performing work connected with exploration and development of natural resources on the outer Continental Shelf, regardless of whether the type of work in which they are engaged can be classified as maritime. See 43 U.S.C. § 1333(b); Fontenot, 179 F.3d at 972. Before the OCSLA, these persons were beyond the geographical reach of state compensation programs and outside the coverage of LHWCA. Again, the language of

the statute is significant:

> (b) Longshore and Harbor Workers' Compensation Act applicable . . .
>
> With respect to disability or death of an employee resulting from any injury occurring as the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf, compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act . . . .

43 U.S.C. § 1333(b).

Although a worker recovering compensation under the LHWCA cannot seek additional payment from his employer, he may recover for injuries resulting from the negligence of third parties. 33 U.S.C. §§ 905, 933(a); see also Fontenot, 179 F.3d at 972. In cases where the injured employee sues a vessel for negligence in causing the injury, "the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b). If LHWCA coverage applies via the OCSLA, the LHWCA allows employer liability to the extent of reciprocal indemnity agreements by which the employer and the vessel agree to defend and indemnify the other for damages arising out of employee injuries. 33 U.S.C. § 905(c). The statute includes both the owner and the operator in the definition of "vessel." 33 U.S.C. § 902(21).

**B. Early Case Law Development**

In a 1969 opinion, the United States Supreme Court discussed

the purpose of the OCSLA at length.  See Rodrigue, 395 U.S. at 355-66.  Examining the statute as enacted at that time, which extended federal jurisdiction and law to "fixed structures" on the outer Continental Shelf, the Court found that the legislative history of the OCSLA revealed that fixed drilling platforms should be treated as islands, rather than as vessels.  See id.; see also 43 U.S.C. § 1333 (1978 Amendments).  "Congress decided that these artificial islands, though surrounded by the high seas, were not themselves to be considered within maritime jurisdiction."  Rodrigue, 395 U.S. at 365-66.  The Court remarked that this resulted from Congress's determination that offshore oil and gas activities were more closely related to the adjacent state than traditional transitory maritime activity.  See id. at 355.  Based on these interpretations, the Court held that borrowed state law, not maritime law, constituted the federal law that governed two wrongful death actions resulting from accidents on fixed drilling rigs on the outer Continental Shelf.  Id.

Two other Supreme Court decisions issued in the mid-1980s are relevant to the inquiry here.  In Herb's Welding, Inc. v. Gray, 470 U.S. 414, 416 (1985), the Court concluded that a welder on a fixed offshore drilling platform in Louisiana territorial waters was not covered under the LHWCA directly because the work he was performing

was not maritime employment.[22] "The history of the [OCSLA] at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime activity and that any task essential thereto is maritime employment for LHWCA purposes." Id. at 422. The Court emphasized that tasks such as maintaining pipelines and platforms for drilling were in no way inherently maritime. Id. at 425 ("They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce.")(footnote omitted).

In Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 209 (1986), the Supreme Court considered whether wrongful death actions concerning offshore drilling platform workers who were killed in a helicopter crash en route from the platform were governed by the OCSLA choice of law provision. In the course of explaining that they were not covered, the Court refined the OCSLA situs requirement applicable to the choice-of-law provision. See id. at 218-20. Specifically, the status of the deceased employees as platform workers did not control; instead, the locale of the accident determined whether the OCSLA incorporated state law. Id. at 219. Maritime law applied "[b]ecause the fatalities underlying

---

[22]    Because the issue was not fully briefed and argued, the Court did not address whether the employee was covered via the OCSLA under the theory that, although the accident did not occur on the outer Continental Shelf, the accident arose out of activities on the outer Continental Shelf. Herb's Welding, Inc., 470 U.S. at 426 n.12.

this suit did not arise from an accident in the area covered by OCSLA but rather occurred on the high seas."[23] Id. at 220.

A few years later, the Fifth Circuit added two requirements to the Supreme Court's situs test. See Union Tex. Petroleum Corp. v. PLT Eng'g, Inc., 895 F.2d 1043, 1047 (5th Cir. 1990). The new test required a court to apply state law as surrogate federal law under the OCSLA if: 1) the controversy arises on a situs covered under the OCSLA; 2) federal maritime law does not apply of its own force; and 3) the state law is not inconsistent with federal law. Id. The facts of the case involved disputes between the contractor and the subcontractors over a contract for the "construction of a gathering line on the seabed of the outer Continental Shelf." Id. at 1045. Applying the expanded situs test, the Fifth Circuit concluded that Louisiana law should apply because the gathering line was located on the seabed of the outer Continental Shelf and the subject of the contract was not traditionally maritime. Id. at 1047, 1049. The remainder of the opinion concerns the application of Louisiana law to the parties' disputes, implicitly resolving the third element in favor of the application of state

---

[23]    The Court acknowledged that the compensation provision of the OCSLA imposes a status requirement, in addition to the situs requirement. Tallentire, 477 U.S. at 219 n.2. That provision allows compensation under the LHWCA for "any injury occurring *as the result of* operations conducted on the outer Continental Shelf." 43 U.S.C. § 1333(b)(emphasis added). Because it was not relevant to the case before it, the Court did not resolve whether the deceased workers would be covered under the LHWCA via the OCSLA having suffered injuries resulting from drilling operations on the outer Continental Shelf, although not actually occurring on the outer Continental Shelf. See Tallentire, 477 U.S. at 219 n.2.

law.  See id. at 1050-53.

Without employing the test enunciated in PLT Engineering or
mentioning the OCSLA at all, the Fifth Circuit, in Domingue v.
Ocean Drilling & Exploration Co., 923 F.2d 393 (5th Cir. 1991),
applied state law to an indemnity action between a jack-up drilling
rig owner and a company performing wireline services on the rig.
The owner sought indemnity for damages sought by another company's
worker related to injuries he suffered while performing well-
testing on the rig, which was on the outer Continental Shelf.  See
id. at 394-95.  The Fifth Circuit analyzed the case according to
the two-part, multi-factor test previously developed for the
purpose of analyzing whether maritime law governs a contract
action.  See id. at 395-96 (discussing the test developed in Davis
& Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 316 (5th Cir. 1990)).
The test focuses on the historical jurisprudential treatment of the
contract's subject matter and the specific circumstances of the
case.  Davis & Sons, Inc., 919 F.2d at 316.  With reference to
wireline services, the Fifth Circuit stated that "wireline services
are peculiar to the oil and gas industry and . . . are distinctly
non-maritime in nature" and that the contract did not become
maritime "simply because the wireline services were performed
aboard the drilling rig vessel."  Domingue, 923 F.2d at 396.

Several years later, the Fifth Circuit considered whether
removal was proper in a tort action brought by a man injured while
working on a drilling platform on the outer Continental Shelf.

<u>Hufnagel</u>, 182 F.3d at 344. The plaintiff sued his employer, the platform owner, and the owner of the adjacent jack-up boat. <u>See id.</u> In analyzing whether the federal district court would have had original jurisdiction over plaintiff's tort action, the panel applied a "but-for" test and concluded that the action arose under the OCSLA, which allows federal question jurisdiction. <u>See id.</u> at 348-51. The Fifth Circuit also had occasion to discuss the test to be used in deciding whether a tort action is governed by maritime law. <u>See id.</u> at 351-52. "To give rise to a tort claim in admiralty, an incident must have *both* a maritime situs and a connection to traditional maritime activity." <u>Id.</u> at 351. Finding that the activity giving rise to the tort claim at issue failed both requirements, the Fifth Circuit held that maritime law did not apply and did not prevent removal jurisdiction. <u>Id.</u> at 351-53. Because the court only needed to determine that maritime law did not apply to the cause of action in order to determine that removal was proper, the court did not discuss the other elements of the <u>PLT Engineering</u> choice-of-law test.

## C. <u>Recent Case Law Development</u>

The Fifth Circuit's most recent comprehensive examination of the relationship between the OCSLA and the LHWCA came in an opinion addressing the validity of an indemnity agreement between contractors. <u>See Demette</u>, 280 F.3d at 492. In <u>Demette</u>, the Fifth Circuit examined the following facts: A casing worker was injured

while performing his duties on a jack-up rig attached to the outer Continental Shelf. Id. at 495. The employee sued the rig owner, which then impleaded the plaintiff's employer and the drilling operator for contractual indemnity. Id. After settling with the plaintiff, the employer and the rig owner proceeded in litigation to resolve the indemnity issue. Id. The district court granted summary judgment to the rig owner on its indemnity claim against the employer. Id. The employer argued that either the LHWCA or Louisiana law voided the indemnity agreement. Id. at 494.

The panel majority framed the parties' dispute as including two separate issues, whether the OCSLA called for the application of state law and whether the LHWCA applied to the plaintiff's injuries by way of the OCSLA. Id. at 496. To answer these questions, the panel majority set out a fairly detailed formula that synthesized the approaches of earlier decisions. See id. at 496-498. The first step is to determine whether the dispute falls within section 1333(a)(1) of the OCSLA, which extends the law and jurisdiction of the United States to the outer Continental Shelf and certain devices thereon. Id. at 496-97. Explicitly relying on the statutory language, the majority held:

> The OCSLA applies to all of the following locations:
>
> (1) the subsoil and seabed of the outer Continental Shelf;
>
> (2) any artificial island, installation, or other device if
>     (a) it is permanently or temporarily attached to the seabed of the outer Continental Shelf, and

14

      (b) it has been erected on the seabed of the outer
          Continental Shelf, and
      (c) its presence on the outer Continental Shelf is
          to explore for, develop, or produce resources
          from the outer Continental Shelf;

  (3) any artificial island, installation, or other device
    if
      (a) it is permanently or temporarily attached to the
          seabed of the outer Continental Shelf, and
      (b) it is not a ship or vessel, and
      (c) its presence on the outer Continental Shelf is
          to transport resources from the outer
          Continental Shelf.

Id. at 497.

    If the location of the activity giving rise to the dispute is
covered by the OCSLA, the analyzing court proceeds to the choice-
of-law question.  See id.  For this determination, the majority
relied on the three-part test from PLT Engineering.  Demette, 280
F.3d at 497.  That is, state law governs if:  1) the controversy
arises on an OCSLA situs; 2) maritime law does not apply by its own
force; and 3) state law is not inconsistent with federal law.  Id.

    The third section of the Demette approach addresses whether
the LHWCA applies to employee injuries.  See id. at 497-98.  The
panel majority refers to this as the "status test."  The decision
reads, "In order for the LHWCA to apply by virtue of section
1333(b), notwithstanding any application of the LHWCA of its own
force,[24] the injured worker must satisfy the 'status' requirement
of section 1333(b) as well as the situs requirement of section

_____

     [24]    The Demette case involved the argument, not raised here, that the
plaintiff was covered by the LHWCA directly and by virtue of the OCSLA and,
therefore, section 905(b) took precedence over 905(c).  See id at 502.

1333(a)(1)." <u>Id.</u> at 498 (footnote added). The "status" test asks whether the injuries occurred as "the result of operations conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf." 43 U.S.C. § 1333(b). If the injuries are related in the manner indicated to operations on the outer Continental Shelf, they fall within the scope of the LHWCA.

In application to the facts before it, the panel majority held that the jack-up rig, while still a vessel, was covered by the OCSLA under the second section of its "situs" formulation. <u>Demette</u>, 280 F.3d at 498 and n.18. As the situs question was answered in the affirmative, the panel majority next considered whether maritime law applied by its own force. <u>Id.</u> at 500.

Because the parties' dispute was contractual, this step required the application of the previously-developed test for determining whether a contract was maritime. <u>See</u> <u>id.</u> at 497 (stating that maritime law applies by its own force to maritime contracts); <u>Domingue</u>, 923 F.2d 395-96 (analyzing a contract using factors enunciated in <u>Davis & Sons</u> for the purpose of deciding whether it was governed by maritime law). The panel majority determined that the contract was maritime, basing its decision, primarily, on the historical treatment of contracts for casing services as maritime, but also on the factual conclusion that the

16

contract dealt with maritime work performed on a vessel.[25]  See Demette, 280 F.3d at 500-01.

"Having concluded that the OCSLA applies, but does not incorporate state law, the only remaining issue under the OCSLA is whether the LHWCA applies to [the plaintiff] by virtue of section 1333(b) of the OCSLA." Demette, 280 F.3d at 501.  For this portion of the analysis, the panel majority acknowledged that casing work was "the model case" of work meeting the status test.  Id.

The final portion of the opinion explains how the indemnity limitations of the LHWCA should be applied to employee injuries that qualify for LHWCA compensation via the OCSLA.  See id. at 502. The opinion's bottom line is that section 905(c) of the LHWCA applies and limits enforcement of indemnity agreements to "reciprocal indemnity provision[s]" between employers and vessel owners for OCSLA cases in which the negligence of the vessels caused the injuries that allowed LHWCA compensation.  See id. at 503; 33 U.S.C. § 905(c).

For all of its helpful guidance on issues related to disputes arising from activities on the outer Continental Shelf, Demette leaves this court with several unanswered questions, relating to issues such as the relationship between the choice-of-law provision and the compensation provision, the application of the

_____

[25]    The panel majority did not reach the third prong of the PLT Engineering test regarding consistency between state and federal law because it found that state law did not apply to any extent.  Demette, 280 F.3d at 500 n.30.

17

inconsistency prong of the <u>PLT Engineering</u> test, and the continued vitality of the "but-for" test.  Although failing to answer directly any of this court's questions, an opinion issued just over seven months after <u>Demette</u> offers a little more insight into the issues.  In <u>Diamond Offshore Co. v. A&B Builders, Inc.</u>, 302 F.3d 531 (5th Cir. 2002), the Fifth Circuit considered the validity of a reciprocal indemnity agreement as it related to the injury of a welder on a semi-submersible drilling rig.  The employer argued, on appeal, that the indemnity agreement was void because it contravened section 905(b) of the LHWCA and that state law governed the contract and invalidated the indemnity provisions.  <u>See</u> <u>id.</u> at 541.

Taking up the section 905(b) issue first, the Fifth Circuit followed the lead of the <u>Demette</u> opinion and held that both the situs and status requirements must be met in order for an employee to recover LHWCA benefits by virtue of section 1333(b).  <u>Id.</u> at 541.  The court concluded that the summary judgment evidence was insufficient to determine whether the location of the employee's injury met the situs test and remanded the case for development of the record.  <u>Id.</u> at 545.  Despite its ruling with regard to the insufficiency of evidence, the Fifth Circuit addressed the status element and found that it was satisfied.  <u>Id</u> at 546-47.  Although it mentions the "but-for" test, the opinion relies instead on the statutory language itself to assess status.  <u>See</u> <u>id.</u> at 546.  The court also examined the indemnity agreement to determine whether it

would meet the section 905(c) reciprocity requirement.  _Id._ at 547-48.  The indemnity provisions were sufficiently reciprocal, the court determined.  _Id._ at 548.

The Fifth Circuit then turned to the issue of whether state law applied to the contract.  _Id._ at 549.  By so doing without resolving the LHWCA question, the court indicated that whether the injury is covered by the LHWCA via the OCSLA is a separate issue from whether state law applies to the cause of action.  Reciting the _PLT Engineering_ test, the court assumed for purposes of its opinion that the first and third prongs would lead to the application of state law, but found that maritime law applied of its own force to the contract.  _Id._ at 549.  In order to reach that conclusion, the Fifth Circuit employed the maritime contract test of _Davis & Sons_.  _See id._ at 549-50.

In July of this year, the Fifth Circuit again addressed whether indemnity provisions were enforceable in connection with a suit against the vessel owner brought by an employee injured on a jack-up drilling rig operating on the outer Continental Shelf.  _Hoda_, 419 F.3d at 380.  The parties' dispute centered on whether the Louisiana Oilfield Anti-Indemnity Act applied to invalidate the indemnity provisions or federal maritime law applied to allow them.  _See id._  As to the proper analytical approach, the court did not mention the detailed formula of _Demette_ (or the OCSLA, for that matter).  _See Hoda_, 419 F.3d at 381-83.  Instead, the discussion was limited to whether the contract was maritime.  _See id._  Finding

that it was, the Fifth Circuit affirmed the district court decision that "the contract's indemnity provision [was] enforceable under general maritime law." Id. at 383.

### III. Analysis

None of the cases studied by the court or cited by the parties directly addresses the precise factual scenario and issues that the court now faces. As the court has "comb[ed] through [the] bewildering array of cases" without "finding an identical fact situation,"[26] the court opts for following the most evolved Fifth Circuit analytical approach, as best described in Demette. Plugging the facts of this case into the Demette analysis, the court concludes that the cause of action is governed by the OCSLA, which, in this case, calls for the application of Louisiana substantive law and for compensation pursuant to the LHWCA. After explaining its conclusions in a step-by-step format, the court will note the effects of its decision on the parties' pending motions.

### A. Application of Demette

The first step is the situs test, by which this court must determine whether the pending dispute is within the federal jurisdiction as extended by section 1333(a)(1) of the OCSLA. As to this inquiry, Demette offers a clear answer. A cause of action, such as the one currently before this court, arising from an injury on a jack-up drilling rig temporarily attached to the outer

---

[26]    Smith, 960 F.2d at 461.

Continental Shelf and erected thereon for the purpose of drilling oil falls under federal jurisdiction pursuant to the OCSLA. See Demette, 280 F.3d at 498-99.

Because the OCSLA applies, the court moves to step two, whether state law governs. The first prong of the PLT Engineering test duplicates the situs test; therefore, the court need not address it again. See 895 F.2d at 1047. The second prong, whether federal maritime law applies by its own force, requires considerably more discussion. Unlike Demette, the case before this court involves a tort action. The Fifth Circuit does not employ the Davis & Sons multi-factor test to assess whether a tort is maritime in nature. See Hufnagel, 182 F.3d at 351. Instead, the proper test has two parts: a maritime situs and a nexus to traditional maritime activity. Id.; see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 534 (1995); Executive Jet Aviation, Inc. v. City of Cleveland, Oh., 409 U.S. 249, 268 (1972).[27]

_____

[27]     In Garret v. Dean Shank Drilling Co., 799 F.2d 1007, 1010 n.2 (5th Cir. 1986), the Fifth Circuit relied on an earlier case in stating "that Congress intended by the 1972 amendments to the LHWCA to preserve within federal admiralty jurisdiction the traditional maritime tort remedy of LHWCA-covered employees for injuries in the course of employment suffered on navigable waters and caused by the negligence of a vessel, broadly defined, while on navigable waters, notwithstanding the new rule of Executive Jet Aviation . . . that a maritime connexity as well as a maritime location was thenceforth necessary for admiralty tort jurisdiction." Although the employee in that case was covered by the LHWCA, it was not by way of the OCSLA. The more recent Fifth Circuit case law indicates that both prongs of the maritime tort test are significant in OCSLA cases. Cf. Diamond, 302 F.3d at 549 (testing whether maritime law applied by its own force without regard for its resolution of whether the LHWCA applied via section 1333(b) of the OCSLA); Hufnagel, 182 F.3d at 344, 351-52 (finding that the plaintiff's action failed to meet either prong of the maritime tort test without reference to the plaintiff's pending LHWCA claim).

The first part is met if the tort occurred on navigable water or, for an injury suffered on land, if it was caused by a vessel on navigable waters. Hufnagel, 182 F.3d at 351; see also Jerome B. Grubart, Inc., 513 U.S. at 534. The second part depends on whether the incident involved caused a "potentially disruptive impact on maritime commerce" and whether the general character of the activity is substantially related to traditional maritime activity. Jerome B. Grubart, Inc., 513 U.S. at 534 (quoting Sisson v. Ruby, 497 U.S. 358, 364 n.2 (1990)); see also Hufnagel, 182 F.3d at 352 and n.9.

The maritime situs test, albeit very different from the OCSLA situs test, is also satisfied in this case. Plaintiff Herbert Dozier's injury occurred on a jack-up drilling rig over navigable waters. Plaintiffs argue that the drilling rig was a fixed platform,[28] but that ignores the Demette court's explicit confirmation that a jack-up drilling rig is a vessel that retains its status as a vessel even when attached to the seabed. See Demette, 280 F.3d at 498 n.18. That, however, does not end the inquiry into the application of maritime law.

The connection test is not met here. The determination keys

---

[28]     See Plaintiffs' Reply, Docket Entry No. 32, p. 4 ("The Plaintiff [sic] contends that at the time of his injury, the ROWAN FORT WORTH was secured to the seabed of the outer continental shelf and became a fixed platform as recognized by the OCSLA."), p. 10 ("The Plaintiffs would again state that at the time of Mr. Dozier's injury, the ROWAN FORT WORTH was no longer considered a vessel[,] but[,] under the current case law in the jurisdiction, the Fifth Circuit has held that a drilling rig, once secured to the seabed is considered an artificial island under the OCSLA.").

on whether the application of special admiralty rules is justified in light of the relationship between the alleged tort activity and activity traditionally governed by maritime law. Hufnagel, 182 F.3d at 352. Traditionally, maritime law primarily concerns the movement of vessels upon waters. See Executive Jet Aviation, Inc., 409 U.S. at 270. The Supreme Court explained the reach of maritime jurisdiction in this way:

> That law deals with navigational rules . . . . When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

Id. Far from being closely related to traditional maritime activity, Plaintiff Herbert Dozier's work on a stationary jack-up drilling rig involved traditional oil and gas activity. In fact, wireline services repeatedly have been recognized as nonmaritime in nature. See, e.g., Domingue, 923 F.2d at 396; PLT Eng'g, Inc., 895 F.2d at 1050; Thurmond v. Delta Well Surveyors, 836 F.2d 952, 955 (5th Cir. 1988). Because both the maritime situs and the connection tests must be met for maritime law to apply to a negligence action, the court finds that maritime law does not apply by its own force.

Defendants argue that maritime law does apply by its own force because the cause of action is under section 905(b) of the LHWCA. As the court understands Defendants' position, they contend that

negligence suits brought under section 905(b) are always governed by maritime substantive and procedural law. Yet, neither the provisions of the LHWCA nor the cases relied on by Defendants support that conclusion. The LHWCA does not specify the law applicable to negligence actions within its scope and, certainly, does not dictate the application of maritime negligence law. See Fontenot, 179 F.3d at 977 (affirming that the "LHWCA itself does not provide the rule of decision in actions against third parties");[29] Parker v. S. La. Contractors, Inc., 537 F.2d 113, 117 (5th Cir. 1976)(noting the confusion spawned by Congress's failure to specify the applicable standard of care for section 905(b) actions). Moreover, Defendants rely on cases that address, not whether all actions filed under section 905(b) are inherently maritime, but whether section 905(b) transforms an otherwise maritime claim into a *nonmaritime* claim arising under federal statutory law.

For example, Defendants cite Russell v. Atlantic & Gulf Stevedores, Inc., 625 F.2d 71 (5th Cir. 1980), for the proposition that all plaintiffs are not entitled to a jury trial for claims brought under section 905(b). But Russell involves the death of a boarding agent who drowned as he attempted to board a vessel owned

---

[29] A distinction needs to be made between Fontenot's view on the absence of a designation of the applicable rule of law and its statement that section 905(b) of the LHWCA provides injured workers with a federal third-party cause of action. See 179 F.3d at 975, 977. The former relates to the applicable substantive law and the latter is a matter of authority.

by the defendant, a claim that clearly meets both the maritime situs and connection tests for the application of maritime law. See id. at 71. The plaintiff in that case argued, in support of her demand for a jury trial, that section 905(b) created a negligence cause of action separate from that under maritime law and, thus, her action was not subject to admiralty rules, but to the Federal Rules of Civil Procedure. See id. at 72. To this, the court responded that section 905(b) did not create a new federal cause of action but "merely preserved an injured worker's right to recover damages from third parties in accordance with nonstatutory negligence principles." Id. Because the plaintiff's claim was based on general maritime law, the court explained, she was not entitled to a trial by jury. Id. Read closely, the case stands for the proposition that a maritime negligence claim does not lose its maritime status and become a claim arising under federal nonmaritime law simply because it is covered by section 905(b). The court did not address the converse, whether a nonmaritime negligence action covered by section 905(b) is thereby converted into a maritime claim.

Similarly, in another case cited by Defendants, the district court held that section 905(b) did not create federal question jurisdiction. Giacona v. Capricorn Shipping Co., 394 F. Supp. 1189, 1194 (S.D. Tex. 1975). There, the defendants removed a negligence action based on the claims of two longshoremen who were injured on navigable waters allegedly at the fault of the vessel

25

owners.  Id. at 1189-90.  The plaintiffs' causes of action unquestionably fell within admiralty jurisdiction.  Id. at 1191. The question was whether a maritime action, which is normally not removable pursuant to the saving-to-suitors provision of original admiralty jurisdiction,[30] became removable by the application of section 905(b) of the LHWCA.  See id. at 1189-90.  The Fifth Circuit answered in the negative.  Id. at 1194.  Again, the answer only guides cases in which a party seeks to transform a maritime tort claim into a nonmaritime, federal question action, *not* whether a nonmaritime tort is pulled into admiralty jurisdiction by virtue of section 905(b).

The same essential flaw in logic spoils Defendants' reliance on Parker, which involved a tort action for injuries suffered by a truck driver hurt while walking across a ramp designed for loading and unloading vehicles on a barge.  537 F.2d at 114-15.  Pursuant to the jurisprudence at that time, the Fifth Circuit found that the claim did not fall under maritime jurisdiction.  Id. at 116.  The court held that section 905(b) neither extended admiralty jurisdiction to cover the plaintiff's action nor converted his ordinary tort into a federal cause of action.  Id. at 117, 118. The Fifth Circuit specifically stated:

> The fact that compensation coverage was expanded to
> ensure that the availability of compensation benefits
> would no longer depend upon the 'fortuitous circumstance
> of whether the injury occurred on land or over water,'

---

[30]    See 28 U.S.C. § 1333.

26

however, does not imply that admiralty jurisdiction has been extended to embrace noncompensation claims brought by employees against parties other than their employers. Indeed, a careful reading of the provision of the 1972 Amendments governing third party actions and the pertinent legislative history leads us to the opposite conclusion.

Id. at 116-17. The court affirmed the district court's conclusion that it lacked jurisdiction over the plaintiff's claim.

The court noted that the legislative history did not clarify the applicable standard of care for the third-party negligence actions under section 905(b), but did make clear that no "new or broader cause of action in admiralty" was intended. Id. at 117. Because the court acknowledged that not all compensation claims are covered by admiralty law and that "[p]ersons to whom compensation is payable under the Act retain the right to recover damages for negligence against the vessel," the court implicitly found that not all actions under section 905(b) are maritime in nature. Id. This court concludes from this implication that nonmaritime claims are not converted into maritime claims by virtue of the application of section 905(b).[31]

None of the cases cited by Defendants or located by the court preclude the application of state negligence law to a claim that is

---

[31] With regard to whether the action arises under the OCSLA, Defendants argue that, "although the Federal Court may have jurisdiction of claims under the OCSLA, substantive law governing a cause of action by an injured worker against a 'vessel' on the outer Continental Shelf is § 905(b)." Defendants' Response, Docket Entry Nos. 28, 29, p. 8. This statement wholly contradicts one kernel of law explicated by the above cases, to wit, that section 905(b) does not create a new cause of action, but depends on preexisting substantive law. See Russell, 625 F.2d at 72; Parker, 537 F.2d at 117; Fontenot, 179 F.3d at 977.

subject to the indemnity limitations of section 905(b) of the LHWCA.[32]  Granted, many of the examples in case law of section 905(b) actions fall within maritime jurisdiction.  Naturally, a lot of negligence actions against vessels involve traditional maritime activities and, thus, are maritime in nature.  However, if maritime law applied to all actions under section 905(b), the Demette court would not have set out such an elaborate choice-of-law analysis.  The only relevant question would be whether the action fell within section 905(b).

Defendants also argue that the test for determining whether admiralty jurisdiction applies to a tort points to the governance of maritime law.  Although they paraphrase the applicable test, Defendants address only the first prong, whether the tort occurs on a maritime situs.  As explained above, the court agrees that the alleged negligent activity occurred on a maritime situs, but finds

---

[32]  One of the cases cited by Defendants, Stevenson v. Point Marine, Inc., 697 F. Supp. 285, 288 (E.D. La. 1988), states, "In the LHWCA context, a longshoreman's action against a vessel owner for negligence arises under the general maritime law–not under the LHWCA."  The district court referred to a negligence action against a vessel owner as "a creature of nonstatutory maritime law."  Id.  That case, like Russell, addresses whether a plaintiff who brought a maritime tort claim (based on an injury suffered on a vessel while unloading equipment onto a drilling platform) was entitled to a jury.  Stevenson, 697 F. Supp. at 286.  The plaintiff in Stevenson argued that, because the case was under the OCSLA, the court had federal jurisdiction independent of maritime jurisdiction.  Id. at 286-87, 288.  The court disagreed because the OCSLA, by incorporating the LHWCA (specifically section 905(b)) did not create a new statutory right, but simply limited the plaintiff's rights against vessel owners.  Id. at 288.  The court's indication that maritime law provided the source of the substantive negligence law for the case should not be read more broadly than the facts of that case require.  The statements are made in reference to a negligence action that was very clearly maritime in nature.  By comparison, a contemporaneous opinion out of the same district indicated that Louisiana state law applied to a tort claim subject to the LHWCA.  See Rowe v. Dolphin-Titan Int'l, 655 F. Supp. 186, 188 (E.D. La. 1987).

a nexus to traditional maritime activity to be lacking.

Finding that maritime law does not apply by its own force, the court must consider the third part of the PLT Engineering test, whether state law is inconsistent with federal law. See 895 F.2d at 1047. The concern here is that the state law employed must be consistent with federal policy as a whole. Cf. Hodgen, 87 F.3d at 1526 ("When federal law assimilates state law, it normally assimilates only that portion of state law consistent with federal policy . . . ."). Although this part of the test has not received much discussion in case law, two points are fairly clear. One is that state law applies to the extent that it is "applicable and not inconsistent" with the OCSLA and other federal laws. 43 U.S.C. § 1333(a)(2)(A). After examining the legislative history, the Supreme Court concluded that Congress recognized that some legal areas would lack applicable federal law and that state law would be used to fill those gaps. See Rodrigue, 395 U.S. at 358. This implies that both federal and state law can apply to the same claim. State law applies except where it is inconsistent with applicable federal law. See 43 U.S.C. § 1333(a)(2)(A); Fontenot, 179 F.3d at 977 (commenting that, if the LHWCA had applied, Louisiana law would have governed the case except with regard to the allocation of fault, an area in which state law was inconsistent with the LHWCA third-party fault scheme); Loredo Offshore Constructors, Inc. v. Hunt Oil Co., 754 F.2d 1223, 1230 (5th Cir. 1985)(stating that state law applies to the outer

Continental Shelf "except when inconsistent with federal law").

A second point is that the OCSLA choice-of-law provision is concerned with inconsistencies in substantive law.  Cf. PLT, Eng'g, Inc., 895 F.2d at 1050 (stating that the "OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply" despite any contractual provision pointing to some other body of law).  Where substantive law varies between federal and state, federal law controls.  See 43 U.S.C. § 1333(a)(2)(A).

Defendants argue that Louisiana law is inconsistent with section 905(b) of the LHWCA.  In order to address this argument, the court must skip ahead to the "status" test portion of the Demette approach, which asks whether the LHWCA applies to an employee's injury via the OCSLA.  The "status" test is easily met in this case.  The injuries about which Plaintiff Herbert Dozier complains allegedly occurred during his wireline work on a drilling rig attached to the outer Continental Shelf.  In the language of the "but-for" test, but for his employment involving the production of minerals on the outer Continental Shelf, Plaintiff Herbert Dozier would not have be injured.  Cf.  Hufnagel, 182 F.3d at 350 (applying the "but-for" test).  Based on the "status" test, section 1333(b) of the OCSLA calls for the application of the LHWCA, and section 905(c) of the LHWCA calls for the application of section 905(b) (with some modification to the indemnity limitations).

Returning to Defendants' argument that Louisiana law conflicts

with 905(b), the court finds no conflict between Louisiana law and section 905(b) within the area of negligence law. In fact, the LHWCA explicitly contemplates negligence actions by injured workers against third parties, including vessel owners. See 33 U.S.C. §§ 905(b), 933; Fontenot, 179 F.3d at 976 (noting that imposing third-party liability is not inconsistent with the OCSLA or the LHWCA). Nothing in federal law or policy leads the court to a contrary conclusion.

Of course, the "inconsistency" of interest to Defendants does not concern state negligence law, but the right to a jury. Defendants would prefer that maritime law apply so that a jury trial would not be allowed. The argument, such that it is, seems to present nothing more than a new angle on Defendants' contention that maritime law applies to Plaintiffs' action. For at least a couple of reasons, the court disagrees with Defendants' attempt to restrict Plaintiffs' access to a jury. First, the conflict identified by Defendants is procedural, rather than substantive. The court does not read section 1333(a)(2)(A) as referring to nonsubstantive inconsistencies.

Second, and more importantly, maritime law does not apply to this case. As discussed above, section 905(b) does not identify a particular source of substantive or procedural law that should be applied in any given case. It certainly does not mandate the application of admiralty rules. Rather, governance by maritime principles is a function of whether the negligence action meets

both prongs of the maritime tort test, which is not the case here. Therefore, admiralty procedures are not implicated.

It is against this background that the court considers the parties' specific requests.

**B.  Plaintiffs' Motion for Leave to Amend**

Federal Rule of Civil Procedure ("Rule") 16(b) governs amendment of the pleadings after the expiration of a scheduling order deadline.  S & W Enters., L.L.C. v. SouthTrust Bank of Ala., 315 F.3d 533, 536 (5th Cir. 2003).  "Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave."  Id.  In deciding whether to modify the scheduling order, the Fifth Circuit set out four factors to be considered:  "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) [the] potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice."  Id. (quoting with modifications Reliance Ins. Co. v. La. Land & Exploration Co., 110 F.3d 253, 257 (5th Cir. 1997)).

In light of the relevant legal authority, it is clear that Plaintiffs' amended complaint does not change the nature of the suit; it simply clarifies the jurisdictional basis and correctly identifies the law that governs Plaintiffs' negligence claim.[33]  The

---

[33]    Plaintiffs also increase the amount of damages sought, but Defendants do not address this change.

amendment is largely cosmetic. Plaintiffs' only explanation for amending is that they discovered additional facts that warranted correction. Plaintiffs' explanation does little to explain why they were unable to amend within the time allotted by the court. Nevertheless, the amendment is important in that it comports with the applicable legal authority. Defendants face no prejudice because the above analysis would be required and would lead to the applications of the OCSLA and Louisiana law regardless of Plaintiffs' statements to the contrary in their original complaint. The absence of prejudice renders the fourth factor inapposite. On balance, the court finds that the amendment should be allowed.

**C.** **Defendants' Motion to Strike Jury Demand**

As the court has determined that the OCSLA requires that Louisiana law govern Plaintiffs' negligence suit, Plaintiffs are entitled to a jury trial. See <u>Debellefeuille v. Vastar Offshore, Inc.</u>, 139 F. Supp.2d 821, 824 (S.D. Texas 2001). Other than arguing against the application of state law, Defendants offer no reason to deny Plaintiffs a trial by jury. A proper demand has been made and should be honored.

**IV. Conclusion**

Based on the foregoing, the court **GRANTS** Plaintiffs' Motion for Leave to Amend and **DENIES** Defendants' Motion to Strike Jury Demand.

SIGNED in Houston, Texas, this 29th day of September, 2005.


_____
Nancy K. Johnson
United States Magistrate Judge